## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

PIERRE D. COSBY,

                                        Petitioner,

            v.                                          9:12-CV-704
                                                        (LEK/ATB)

THOMAS LaVALLEY, Superintendent,

                                        Respondent.

PIERRE D. COSBY, Petitioner, pro se
LISA E. FLEISCHMANN, AAG, for the Respondent

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## REPORT-RECOMMENDATION

        This matter has been referred to me for Report and Recommendation, pursuant

to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Lawrence

E. Kahn, Senior United States District Judge.

        Presently before this court is a petition, seeking a writ of habeas corpus,

pursuant to 28 U.S.C. § 2254. (Petition ("Pet.")) (Dkt. No. 1).  Petitioner brings this

action, challenging a judgment of conviction rendered on August 21, 2006, after a jury

trial in the Supreme Court, Onondaga County.  Petitioner was convicted of one count

of Rape, First Degree and two counts of Menacing, Second Degree.  He was sentenced

to twenty five years incarceration plus five years post-release supervision.  He

received unconditional discharges on the two menacing counts.

        Petitioner was assigned new counsel for his appeal.  Prior to filing the direct

appeal, counsel filed a motion to vacate petitioner's conviction pursuant to N.Y. Crim.

Proc. Law § 440.10.  After a hearing, the trial judge denied the motion, and the appeal

of the motion to vacate was consolidated with petitioner's direct appeal.  On February

10, 2011, the Appellate Division, Fourth Department affirmed petitioner's conviction and the denial of the section 440.10 motion, and the New York Court of Appeals denied leave to appeal on April 20, 2011. *People v. Cosby*. 82 A.D.3d 63 (4ᵗʰ Dep't ), *lv. denied*, 16 N.Y.3d 857 (2011).

Petitioner raises the following grounds for habeas review:

(1)   Petitioner's trial counsel was ineffective for failing to advise petitioner that the decision to testify was his alone and for failing to call witnesses.

(2)   The trial court erred in failing to issue a *falsus in uno* instruction in response to a note from the jury.

(3)   The trial court denied petitioner a fair trial by allowing the victim to testify that she identified petitioner in an out-of-court proceeding.

(4)   The prosecutor's expert was improperly permitted to testify as to the reason for the victim's lack of injury.

Respondent has filed an answer, together with the pertinent state court records and a memorandum of law. (Dkt. Nos. 9, 10, 12). Respondent argues for denial of the petition on both substantive and procedural grounds. (Dkt. No. 9). Petitioner has filed a traverse. (Dkt. No. 17). For the following reasons, this court agrees with respondent and will recommend denial of the petition.

**DISCUSSION**

I.   **Relevant Facts**

A.   **The Trial**

The conviction in this case resulted from the sexual assault on A.S.[1] on

---

[1] The court will refer to the victim and her family by their initials in order to maintain confidentiality.

September 23, 2005. Petitioner had been attempting to contact A.S. prior to the incident. A.S. testified that one day during the summer of 2005, petitioner parked in front of A.S.'s home and asked one of her siblings if petitioner would speak with A.S. A.S. stepped out on to an outside porch on the second floor, and petitioner called to A.S., but because she did not know him, she went back inside the house. (Trial Transcript ("T") 344-46 – A.S.)

A.S. testified that a few days later, she pulled into a gas station, and petitioner approached her while she was getting gas. (T. 346-47 – A.S.) Petitioner told her that his name was "Alfie," that he had been the one who came to A.S.'s home the other day, and encouraged A.S. to take his cell phone number. (T. 347 – A.S.) A.S. entered the number into her cell phone, but then erased it because she did not want to have it. (*Id.*)

A.S. testified that, later that night, she was parked outside a home where a party was taking place, petitioner pulled up to her parked car, and insisted that A.S. call him. (T. 348 – A.S.) A.S. did not call petitioner because she had erased his number. A.S. pulled away from petitioner's car, and petitioner drove behind her flashing his high beams and driving "real fast." A.S.'s aunt, K.S. was with her in the car and told A.S. to pull over. When she stopped and rolled down her window, petitioner asked why she had not called. A.S. simply stated, "because." (*Id.*) Although petitioner again insisted that A.S. call him, she did not. One month later, petitioner again approached A.S. in a gas station. (T. 349 – A.S.) Some friends of A.S.'s were in the car with her and suggested that she ask petitioner for money. A.S. did as her friends

suggested, and petitioner gave her eight dollars. (T. 350 – A.S.)  However, A.S. testified that she was not "interested" in petitioner.  She only asked him for money because her friends "hyped" her up. (T. 350-51 – A.S.)

A few days prior to September 23, 2005, A.S. was staying with her twenty-year-old cousin, S.S.  While A.S. was sitting on the porch at S.S.'s home, petitioner pulled up in his car, gave A.S. his number on a piece of paper and told her that she should call him if she wanted to "chill." (T. 351 – A.S.)  A.S. took the number and looked at it, but later ripped up the paper. (*Id.*)  On the night of September 23, K.S. dropped A.S. off at S.S.'s home at approximately 1:00 a.m. (T. 357 – A.S.)  A.S. testified that, when she arrived, her boyfriend and one of his friends were watching television in the living room. (T. 358-59 – A.S.)  The men decided to go out, and A.S. had a discussion with her boyfriend about his return.  After the men left, A.S. fell asleep on the couch, and S.S. went to her bedroom. (T. 359-60 – A.S.)

At approximately 4:00 a.m., petitioner went to S.S.'s house and rang the doorbell.  The doorbell woke A.S., but it was S.S. who answered the door.[2] (T. 362-63 – A.S.)  Petitioner told S.S. that A.S. had invited him over, but S.S. told petitioner that A.S. was sleeping. (T. 572-74, 609 – S.S.)  Petitioner entered the house and started to go upstairs to the apartment.[3] (T. 574 – S.S.)  S.S. testified that she did not say anything.  She just followed petitioner up the stairs and into the apartment. (T. 574-76

---

[2] A.S. testified that she did not answer the door because she thought it was her boyfriend, and they had argued before he left. (T. 363 – A.S.)  A.S. told him that she was not going to open the door when he returned. (*Id.*)

[3] A.S. testified that there were some stairs outside the door to S.S.'s apartment that you had to climb in order get to the outside door. (T. 360 – A.S.)

– S.S.) S.S. testified that "everything looked like it was ok, so she returned to her bedroom. (T. 575 – S.S.) Petitioner found A.S. on the couch and sat at her feet. A.S. testified that she thought it was her boyfriend, who had returned. She was still angry with him, so she pretended to be sleeping. (T. 365 – A.S.) However, she then felt someone unbuckle her belt and lick her neck and back. (*Id.*) She realized it was not her boyfriend when she felt petitioner's mustache. (T. 366 – A.S.) She opened her eyes and started "yelling." Petitioner said, "it's me, Alfie, let me eat you out." (*Id.*) As A.S. was yelling at petitioner, he got up and started walking quietly into S.S.'s bedroom. (T. 367 – A.S.) A.S. testified that, at that time, she opened her eyes to look to see who it was. (*Id.*)

S.S. testified that petitioner slid into her bed and rubbed her leg. (T. 576-77 – S.S.) S.S. tried to get out of bed, but petitioner told her to lie back down, but S.S. told him that she had to use the bathroom. (T. 578 – S.S.) Petitioner stayed in S.S.'s room, and S.S. went into the livingroom and asked A.S. who petitioner was. A.S. told S.S. that she had not called him, and that she did not know who he was, although A.S. testified that she knew petitioner from "looking at him." (T. 368 – A.S.; 579 – S.S.) While petitioner was still in S.S.'s room, the women made telephone calls, using A.S.'s cellular telephone to find out if someone was playing a joke on them.[4] (T. 579 – S.S.) Both women testified that, at first, when S.S. came out of her room, they were not frightened or concerned about petitioner's presence. (T. 369 – A.S.; 579-80 – S.S.)

---

[4] A.S. testified that she was making telephone calls to friends who could come and pick her up because she wanted to leave. (T. 369-70 – A.S.) A.S. said that S.S. told her that she did not want to stay either, but petitioner was in her bedroom, and S.S. was scared to go into her room to get her keys and purse. (T. 370 – A.S.)

As she was calling her friends, A.S. looked out the window and recognized the car that was parked out front. (T. 371 – A.S.)  A.S. testified that the friend to whom she was speaking on the telephone told her to look out the window and see if the car was "a blue Oldsmobile Cutlass." (*Id.*)  A.S. stated that she recognized the car in which she had seen "Alfie" a few days before and earlier that night. (T. 371-72 – A.S.)  While A.S. was on the telephone, sitting on the couch, petitioner walked into the livingroom, turned off the kitchen light, and ran toward A.S., screaming at her to give him the telephone. (T. 373-74 – A.S.)  Petitioner then punched A.S. twice, hurting her eye, and cutting the inside of her mouth.[5] (*Id.*)  When S.S. saw petitioner run toward A.S., S.S. tried to run for the door, but petitioner pulled her back, threw her to the floor, and told them to be quiet. (T. 375-77 – A.S.; 586 – S.S.)  A.S. testified that he then dragged both of the women into the bedroom by their legs. (T. 378 – A.S.)  S.S. testified that she was not sure how petitioner grabbed A.S., but testified that he grabbed S.S. by her arm and dragged her that way. (T. 588 – S.S.)  He pushed S.S. into a closet and rigged the door so that she could not get out. (T. 379-80 – A.S.; 589, 593 – S.S.)

Petitioner told A.S. that if she did not calm down, he would kill her. (T. 381, 382 – A.S.)  He pulled "something" silver out of his pocket and told A.S. that it was a gun. (T. 381– A.S.)  He ordered A.S. into the livingroom, told her to sit on the couch, and said that if S.S. was not in the closet, he would kill her too.  He ordered A.S. to undress and lay down.  He raped A.S. vaginally while holding the gun to her head. (T.

---

[5] S.S. testified that she saw petitioner hit A.S. when S.S. was "laying on the floor and . . . looked up." (T. 587 – S.S.)

383– A.S.)  A.S. asked petitioner why he was doing this, and told him that she had a

son.  Petitioner then stopped what he was doing, said "aw man," got dressed, and

ordered A.S. to get dressed. (T. 384 – A.S.)  S.S. testified that she heard A.S. tell

petitioner that she had a baby, "and everything just stopped." (T. 593, 594 – S.S.)

Petitioner ordered A.S. into the closet. (T. 385 – A.S.)  Petitioner told the

women that his name was not Alfie, that he was from the "east side," and that "this is

because they killed my man."[6] (T. 404 – A.S.)  A.S. testified that she heard petitioner

in the livingroom, shouting "where all the money at?"  Petitioner then told A.S. and

S.S. to count to 100, left the apartment, and drove away. (T. 402-403 – A.S.; 595-96 –

S.S.)  During her testimony, A.S. identified petitioner, sitting in the courtroom. (T.

406-407 – A.S.)

A.S. called K.S. and told her that she had been raped. (T. 407-408 – A.S.; 276-

77 – K.S.)  A.S. testified that she called K.S. rather than calling the police because she

and S.S. were scared. (T. 407 – A.S.)  K.S. put her children in the car and drove over

to S.S.'s apartment. (T. 278 – K.S.)  En route to the apartment, K.S. was stopped for

speeding by Officer Jenny Terrero. (T. 269 – Terrero; 279 – K.S.)  K.S. testified that

when she was pulled over, she was calling 9-1-1. (T. 279 – K.S.)  When K.S.

---

[6] Prior to this testimony, there was a discussion outside the presence of the jury regarding the admissibility of such a statement.  Defense counsel was concerned that mentioning a gang would be prejudicial to the defendant. (T. 389-94.)  Judge Brunetti gave a limiting instruction, which he read to counsel prior to reading it to the jury. (T. 397).  The judge also mentioned that allowing this testimony would not be prejudicial to the defendant because the motive being proffered by this testimony was "entirely inconsistent with the proof up until this point as to the conduct of the person named Alfie in pursuing the witness and that [the assault] was the ultimate result of the rejection of [petitioner's] advances and had nothing to do whatsoever with any gang or retaliation so it actually . . . creates fodder for the defense summation." (T. 398).

explained why she was speeding, Officer Terrero escorted K.S. to S.S.'s apartment and called the information in to the Syracuse Police Department. (T. 270-72 – Terrerro).

A.S. was taken to Upstate Medical Center, where she was examined by certified sexual assault nurse examiner ("SANE") and nurse practitioner, Terese Barr ("Barr"). (T. 492-97, 528). Barr testified that A.S. was sad, weepy, sullen, and quiet, but made very good eye contact and answered questions appropriately. (T. 529). During the examination, Barr noticed that A.S. was wearing her T-shirt inside-out. (T. 533). A.S. told Barr that she had been raped, hit, dragged, and pushed, and that petitioner had not used a condom. (T. 532). Barr noted that A.S. had a sclera hemorrhage, which is a bruise that causes bleeding in the eye. (T. 534). A.S. also had fresh lacerations in her mouth, consistent with the use of blunt force. (T. 535). However, A.S. sustained no vaginal trauma. Barr testified that she would not expect to see trauma to the vaginal area, and that she only sees trauma in 10-20% of sexual assault victims. (T. 520-23). Barr explained that the fact that A.S. had previously given birth and the type of contraceptive she was using would also influence the lack of trauma. (T. 545). Barr also stated that if petitioner had a gun, A.S. would have been less likely to struggle, contributing to the lack of injury. (T. 545-47).

On re-direct examination, A.S. testified that after the incident, but before petitioner's arrest, she was at a garage having her taillight repaired, when petitioner pulled up and asked her why she was going around telling people that she was raped? (T. 475-76 – A.S.) A.S. told petitioner that she saw his car outside of S.S.'s apartment

that night, but petitioner said that someone else had used it. (*Id.*)  A.S. then called Detective Pauline Burnett to report the exchange with petitioner.  (T. 477 – A.S.)

Petitioner was arrested on January 12, 2006, and Detective Burnett took a bucal swab for a DNA sample. (T. 630-31– Burnett).  New York State Police forensic seriologist Gabriel Caceres testified that he analyzed the vaginal swabs taken from A.S. and found the presence of sperm, and that the dry swabs from A.S.'s neck and back tested positive for amylase, which would indicate the presence of saliva. (T. 715, 717 – Caceres).  Forensic scientist Kathleen Hum determined that the DNA profile from the sperm found on the vaginal swab matched the profile from petitioner's bucal swab. (T. 684-88 – Hum).  The likelihood that the profiles would match an unrelated individual was less than one in 66.9 trillion. (T. 686-87).  However, she could not generate profiles from the neck and back swabs. (T. 676 – Hum).

Petitioner's counsel did not call any witnesses, and petitioner did not testify.

### B.    Motion to Vacate

Linda Campbell, Esq., the attorney assigned to handle petitioner's appeal, filed a motion to vacate petitioner's conviction in the trial court.  The basis for the motion to vacate was that petitioner's trial counsel, Patricia Campbell, Esq., was ineffective because she did not inform petitioner that, regardless of counsel's advice,  the ultimate decision of whether to testify was his, and not his attorney's.  Linda Campbell also argued that petitioner's trial attorney was ineffective in failing to call witnesses who would have allegedly testified that petitioner and A.S. had a prior relationship and had been seen together before the assault.

The trial judge, Hon. John Brunetti, held a hearing on the motion and took testimony from Patricia Campbell, petitioner, and various of petitioner's family members in an effort to determine the facts relevant to the motion to vacate. After the hearing, Judge Brunetti issued very specific, numbered findings of fact, together with a lengthy decision analyzing those facts in relation to the law governing effective assistance of counsel. (Dkt. No. 12 at CM/ECF pp. 412-42 (Decision and Order))[7]. Judge Brunetti found that trial counsel failed to tell petitioner that, notwithstanding counsel's advice not to do so, the ultimate decision whether to testify belonged to the defendant, not counsel. Even though this failure was error, Judge Brunetti also found that, even if petitioner had been properly advised, he still would not have testified, or would not have testified to the facts as he described them when he took the stand at the section 440.10 hearing.

With respect to petitioner's claim that his attorney failed to call witnesses who would have testified that petitioner had an ongoing relationship with the victim, Judge Brunetti found that petitioner did not tell his trial attorney about what happened on the evening of the assault, so his trial counsel could not effectively pursue this defense.[8]

---

[7] Judge Brunetti also issued separately paginated "Findings of Fact," (Dkt. No. 12 at CM/ECF pp. 364-70), but reproduced the entire document in his decision. (Dkt. No. 12 at CM/ECF pp. 414-17). As part of the Findings of Fact, Judge Brunetti invited further briefing on seven specific issues regarding petitioner's right to testify, including the effect of the court's finding that the testimony petitioner gave during the section 440.10 hearing would not have been the same testimony he would have given at trial. (*Id.* at CM/ECF pp. 418 - Issue # 7).

[8] At the section 440.10 hearing, petitioner testified that he and A.S. had consensual sex twice on September 23, 2005, once in S.S.'s apartment and once outside in the park. Petitioner speculated that A.S. accused him of rape because she found out that petitioner had another girlfriend who was pregnant with his child, and A.S. wanted to get back at him. (Hearing ("H") at 22-23).

The court also found that none of the proffered witnesses had any admissible or even relevant evidence regarding the incident.[9] (Dkt. No. 12 at CM/ECF p. 412). Because of these facts, counsel's trial strategy was necessarily limited to attacking the credibility of the prosecutor's witnesses. Judge Brunetti denied the petitioner's motion to vacate.

### C. Petitioner's Appeal

Petitioner's direct appeal and the appeal of Judge Brunetti's denial of petitioner's motion to vacate were consolidated. The Appellate Division affirmed both the conviction and Judge Brunetti's decision, and the New York Court of Appeals denied leave to appeal. *People v. Cosby, supra.*

## II. Generally Applicable Law

### A. The AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that, when a state court has adjudicated the merits of a petitioner's claim, a federal court may grant an application for a writ of habeas corpus only if "the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *See also, e.g., Noble v. Kelly*, 246 F.3d 93,

---

[9] Additionally, almost all the witnesses that petitioner states he would have called were related to petitioner. (H. at 24).

98 (2d Cir. 2001); *Brown v. Alexander*, 543 F.3d 94, 100 (2d Cir. 2008).[10]  This is a

"difficult to meet," and "highly deferential standard for evaluating state-court rulings,

which demands that state court decisions be given the benefit of the doubt." *Cullen v.

Pinholster*, __ U.S. __ , 131 S. Ct. 1388, 1398 (2011) (citations omitted).

Under section 2254(d)(1), a state-court decision is contrary to clearly

established Supreme Court precedent if its "conclusion on a question of law is

'opposite' to that of the Supreme Court or if the state court decides a case differently

than the Supreme Court's decision 'on a set of materially indistinguishable facts.'" *Id.*

(quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).  A state court decision

involves an unreasonable application of clearly established Supreme Court precedent

if it correctly identifies the governing legal principle, but unreasonably applies or

unreasonably refuses to extend that principle to the facts of a particular case.  *See

Williams*, 529 U.S. at 413; *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000).

Under the AEDPA, a state court's factual findings are presumed correct, unless

that presumption is rebutted by clear and convincing evidence.  28 U.S.C. § 2254

(e)(1).  If the state court failed to decide a claim "on the merits," the pre-AEDPA

standard of review applies, and both questions of law and mixed questions of law and

fact are reviewed *de novo.  Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

## B.     Exhaustion

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust

---

[10] Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 107-113 (1995).  When presented with these questions, the court was empowered to conduct an independent review of the record. *Id.*

available state remedies, . . . thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation and other citations omitted)); 28 U.S.C. § 2254(b)(1). The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with powers of discretionary review, thereby alerting that court to the federal nature of the claim. *Id.*; *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994).

"A habeas petitioner has a number of ways to fairly present a claim in state court without citing 'chapter and verse' of the Constitution, including '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.'" *Hernandez v. Conway*, 485 F. Supp. 2d 266, 273 (W.D.N.Y. 2007) (quoting *Daye v. Attorney General*, 696 F.2d 186, 194 (2d Cir.1982)).

## C.    Procedural Bar

A federal judge may not issue a writ of habeas corpus if an adequate and independent state-law ground justifies the prisoner's detention, regardless of the federal claim. *See Wainwright v. Sykes*, 433 U.S. 72, 81-85 (1977). A federal habeas court generally will not consider a federal issue if the last state court decision to address the issue "'rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Garvey v. Duncan*, 485 F.3d 709,

713 (2d Cir. 2007) (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)) (emphasis added). This rule applies whether the independent state law ground is substantive or procedural. *Id*.

There are certain situations in which the state law ground will not be considered "adequate": (1) where failure to consider a prisoner's claims will result in a "fundamental miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); (2) where the state procedural rule was not "'firmly established and regularly followed,'" *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991); *James v. Kentucky*, 466 U.S. 341, 348-349 (1984); and (3) where the prisoner had "cause" for not following the state procedural rule and was "prejudice[d]" by not having done so, *Wainwright v. Sykes*, 433 U.S. at 87. In *Garvey v. Duncan*, the Second Circuit stated that, in certain limited circumstances, even firmly established and regularly followed rules will not prevent federal habeas review if the application of that rule in a particular case would be considered "exorbitant." *Garvey v. Duncan*, 485 F.3d at 713-14 (quoting *Lee v. Kemna*, 534 U.S. at 376).

A state prisoner who has procedurally defaulted on a federal claim in state court may only obtain federal habeas review of that claim if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or if he can show that he is "actually innocent." *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (internal quotation and citations omitted). "Cause" exists if "the prisoner can show that some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488

(1986). Prejudice exists if there is a "reasonable probability" that the result of the proceeding would have been different absent the alleged constitutional violation. *Stickler v. Greene*, 527 U.S. 263, 289 (1999).

To demonstrate "actual innocence," a habeas petitioner must show that it is more likely than not that no reasonable juror would have convicted him, but for the alleged constitutional violation. *Murden v. Artuz*, 497 F.3d 178, 194 (2d Cir. 2007), *cert. denied sub nom. Murden v. Ercole*, 552 U.S. 1150 (2008); *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "Actual innocence" requires factual innocence, not "legal" innocence. *Murden v. Artuz*, 497 F.3d at 194. A claim of actual innocence requires petitioner to put forth new, reliable evidence that was not presented at trial. *Cabezudo v. Fischer*, 05-CV-3168, 2009 WL 4723743, at *13 (E.D.N.Y. Dec. 1, 2009) (citing *Lucidore v. N.Y.S. Div. of Parole*, 209 F.3d 107, 114 (2d Cir. 2000)); *Schlup v. Delo*, 513 U.S. at 316, 327-328.

## III. Ineffective Assistance of Trial Counsel

### A. Exhaustion

In his petition for habeas corpus, petitioner raises two grounds for ineffective assistance of trial counsel. He claims that counsel was ineffective because she failed to advise petitioner that the decision to testify was his alone and based on her failure to call witnesses, who would have testified that petitioner and the victim were romantically involved and had been seen together before and after the rape. Petitioner raised both of these grounds in his section 440.10 motion to vacate, and Judge Brunetti denied both on the merits.

In the consolidated appeal, petitioner's counsel raised the following six grounds:

1. Trial counsel was ineffective because she "thwarted" petitioner's right to testify. (Resp't's Ex. A at CM/ECF pp. 24-34).

2. The trial court's *Sandoval* ruling was incorrect. (Resp't's Ex. A at CM/ECF pp. 35-41).

3. The court erred in refusing to give the jury a Falsus in Uno instruction in response to one of the jury's questions. (Resp't's Ex. A at CM/ECF pp. 41-44).

4. The court erred in allowing the prosecution's expert to speculate on the reason for the victim's lack of injuries. (Resp't's Ex. at CM/ECF pp. 44-47).

5. The court erred in denying petitioner's motion for a mistrial after the victim mentioned her out-of-court identification of petitioner. (Resp't's Ex. A at CM/ECF pp. 47-49).

6. The petitioner's sentence was harsh and excessive. (Resp't's Ex. A at CM/ECF pp. 49-51).

(Dkt. No. 12). Although counsel specifically asserted ineffective assistance of counsel, the ***only*** basis for the argument was counsel's error in failing to properly advise petitioner about his right to testify. There was no mention in counsel's brief of counsel's alleged failure to call witnesses. The prosecutor specifically mentioned the trial court's finding regarding the failure to call witnesses and stated that "Defendant concedes as much by *failing to reassert this portion of his ineffective assistance claim in his brief on appeal before this Court.*" (Dkt. No. 12; Resp't's Ex. C at CM/ECF pp. 503). The Appellate Division's decision mentioned only the issue of petitioner's right to testify. *People v. Cosby*, 82 A.D.3d at 64-68.

In her application for leave to appeal to the New York Court of Appeals, counsel submitted a letter-brief, emphasizing the issue of petitioner's right to testify and sought review of the issues "as were presented to the Appellate Division . . . in the briefs which are hereby incorporated by reference thereto and of the arguments as are presented herein." (Dkt. No. 12; Resp't's Ex. F at CM/ECF p. 537-44). The New York Court of Appeals denied leave to appeal in both the direct appeal and the section 440.10 appeal, stating that there was no question of law presented which ought to be reviewed by the court. (Resp't's Exs. H & I at CM/ECF p. 549, 551).

In his traverse, petitioner argues that because he appealed Judge Brunetti's denial of the motion to vacate, the Appellate Division was "given the opportunity" to consider the claim. (Dkt. No. 17 at CM/ECF p. 11). Petitioner was represented by new counsel at his section 440.10 motion and on appeal. The issue of petitioner's witnesses was conspicuously absent from counsel's brief, and the prosecution reasonably interpreted this absence as an intentional omission. Because petitioner failed to raise the claim that counsel was ineffective for failure to call witnesses in the Appellate Division and in the New York Court of Appeals, he has failed to exhaust that portion of his ineffectiveness claim.

### B.    Procedural Default

Although there is no state court decision, specifically finding a procedural default because petitioner failed to exhaust his state court remedies, petitioner cannot return to state court to raise this issue. He cannot return to the trial court because he has already raised the issue and had full consideration of the issue in his section

440.10 motion, and because the issue was specifically omitted from the appeal of his section 440.10 motion.[11]  He cannot return to the Court of Appeals because he did not raise the issue in the Appellate Division, and New York permits only one application for direct review. *Oquendo v. Senkowski*, 452 F. Supp. 2d 359, 368 (S.D.N.Y. 2006) (citing *Spence v. Superintendent*, 219 F.3d 162, 169-70 (2d Cir. 2000); *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991)); N.Y. Rules of Court, Court of Appeals § 500.20.

When petitioner has failed to exhaust his state court remedies, but return to state court is foreclosed, the claim is "deemed" exhausted, but is subject to the procedural default analysis discussed above. *Bossett v. Walker*, 41 F.3d 825 (2d Cir. 1994) (citing *Grey v. Hoke*, 933 F.2d at 120-21).  In order to overcome the procedural default, petitioner would have to show cause for his failure to raise this issue and prejudice resulting from the constitutional violation.

In this case, petitioner has shown no cause for his failure to raise his second basis for ineffective trial counsel.  The reason for new appellate counsel's failure to

---

[11] While the court notes that section 440.10(3)(b) provides only that a court "may" deny a motion to vacate where the grounds raised were determined on the merits in a prior motion, section 440.10 also provides that the trial court "must" deny a subsequent section 440.10 motion when the issue could have been, but was unjustifiably omitted from the on direct appeal. N.Y. Crim. Proc. Law § 440.10(2)(c). Section 440.10(2)(c) is considered a procedural default. *See Fernandez v. Artuz*, 402 F.3d 111, 115 n.4 (2d Cir. 2005) (identifying both section 440.10(2)(a) and (2)(c) as procedural defaults).  Appeals from motions to vacate are discretionary. *See Nichols v. Brown*, No. 09 Civ. 6825, 2013 WL 1703577, at *1 n.2 (S.D.N.Y. April 19, 2013) (review of the denial of a section 440.10 motion is available only in the Appellate Division and only by leave of a judge).  In this case, the appeal from petitioner's section 440.10 denial was consolidated with his direct appeal, and petitioner's counsel failed to raise the second ineffective counsel claim in either appeal.  Thus, arguably, if petitioner went back to state court to attempt to exhaust the second ground for ineffective assistance of counsel, he would be met by a finding that he should have raised the issue when he was allowed to appeal the denial of the section 440 motion.  In any event, the chances of Judge Brunetti deciding the issue again when he has already held an extensive hearing and made extensive findings of fact are exceedingly unlikely.

18

raise the issue in the Appellate Division is likely, as the prosecutor noted in the People's appellate brief, that based upon the trial court's factual finding in the motion to vacate, petitioner's counsel conceded the issue by her failure to raise it. Appellate counsel justifiably focused on the issues that she believed were petitioner's strongest claims. *See e.g. Jones v. Barnes*, 463 U.S. 745 (1983) (appellate counsel not ineffective for failing to raise every nonfrivolous issue on appeal).[12] Because petitioner has shown no cause for his failure to raise the issue, the court need not consider prejudice. Finally, petitioner has not shown that he is "actually innocent" by presenting new and reliable evidence that was not presented at trial. Thus the court will consider only the merits of petitioner's claim that trial counsel was ineffective for failing to inform petitioner that he had the ultimate authority to decide whether to testify at trial.

## C. Merits

### 1. Legal Standard

The constitutional standard for ineffective assistance of counsel was articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-696 (1984). This test requires an affirmative showing that counsel's performance fell below an

---

[12] Petitioner has not raised ineffective assistance of appellate counsel, and this court is not specifically addressing the merits of any such claim. The court is merely citing to *Jones* for the proposition that counsel may justifiably focus on some, but not all issues that could possibly be raised on appeal. Although ineffective assistance of appellate counsel would constitute "cause" for a procedural default, petitioner would have been required to exhaust that claim separately in state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). In New York, a common law writ of error coram nobis, filed in the appellate court, is the proper vehicle for bringing a claim of ineffective assistance of appellate counsel. *People v. Bachert*, 69 N.Y.2d 593, 598, 516 N.Y.S.2d 623, 626 (N.Y. 1987); *Turner v. Miller*, 124 F. App'x 682, 683-684 (2d Cir. 2005).

objective standard of reasonableness, and that prejudice resulted because there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.*, 466 U.S. at 688, 694. An ineffective-assistance claim "must be rejected if the defendant fails to meet either the performance prong or the prejudice prong." *Bennett v. United States*, 663 F.3d 71, 85 (2d Cir. 2011) (citing *Strickland*, 466 U.S. at 697).

When assessing counsel's performance, courts "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998) (quoting *Strickland*, 466 U.S. at 689). Courts should not use hindsight to second-guess sound tactical decisions made by attorneys. *McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999) (citing *Strickland*, 466 U.S. at 689).

In evaluating the prejudice component of *Strickland*, a "reasonable probability" that the outcome of the proceeding would have been different means "a probability sufficient to undermine confidence in the outcome." *Strickland* 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Santone v. Fischer*, 689 F.3d 138, 155 (2d Cir. 2012) (citing *Strickland*, 466 U.S. at 693). Unlike the performance determination, the prejudice analysis may be made with the benefit of hindsight. *McKee v. United States*, 167 F.3d at 106-107 (citing, *inter alia*, *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)).

### 2.    Application

As a result of the section 440.10 hearing, the court found that petitioner

established that, although he informed his trial attorney that he wished to testify, counsel did not advise petitioner that he had the "final say in that regard." The Appellate Division gave deference to the trial court's fact finding in its decision. The Appellate Division properly cited to *Strickland* standard. The court then found that defense counsel committed error by failing to properly advise the petitioner that the final decision was his to make. Notwithstanding counsel's error, the Appellate Division found that petitioner "either would not have testified or would not have given the testimony that he gave at the CPL article 440 hearing," and essentially concluded that counsel's error did not prejudice the petitioner.

This court finds that the Appellate Division did not unreasonably apply *Strickland* in its decision, nor was the court's decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. First, petitioner had an adverse *Sandoval* ruling. The trial court ruled that if petitioner took the stand, he could be cross-examined regarding a prior conviction for criminal possession of a weapon in the third degree, including the facts underlying that conviction. Because the rape occurred at gunpoint, the possibility of such cross examination should have discouraged petitioner from taking the stand.

At the section 440.10 hearing, petitioner testified at length that on the night of September 23, 2005, petitioner was at a club, selling drugs, and A.S. called him to come over to her house. (H. at 105-106). Petitioner testified that, after he arrived, he and A.S. had consensual sex twice, once in S.S.'s apartment and once during a subsequent walk in the park. (H. at 108-110). He testified that he told this to his

attorney prior to trial, and that he wanted the jury to hear "his side." (H. at 111). However, if petitioner had taken the stand to testify to these facts, he would have been admitting to being a drug dealer, and would have been subjected to cross-examination regarding his former weapons conviction, based on the court's *Sandoval* ruling.

Additionally, Judge Brunetti credited trial counsel's testimony at the section 440.10 hearing that petitioner never gave this account to his attorney, and in fact, did not give counsel any information about what happened on the evening in question. The Appellate Division held that the record supported the trial court's finding, based upon petitioner's attorney's opening and her strategy throughout the prosecution. This is a factual finding to which this court must adhere unless petitioner rebuts the finding by "clear and convincing" evidence under 28 U.S.C.        § 2254(e)(1).  Petitioner has not done so.  He is simply rearguing the same facts as he raised in state court, claiming that the courts' decisions were incorrect.

At trial, defense counsel made a very generic, and very short, opening statement. (T. 265-67) (Dkt. No. 12-1).  Counsel focused on the prosecution's witnesses' credibility, simply stating that "their story just doesn't hold up." (T. 266). Counsel also mentioned the DNA evidence stating that "you may or may not hear something about DNA." (*Id.*)  Counsel then stated that "you'll determine DNA or no DNA, nothing changes the fact that the story of the accusing witnesses just doesn't hold up." (T. 267).  If petitioner told counsel that he had consensual sex with A.S. twice that evening, there would be no need to refute DNA evidence because one would expect the DNA to match that of petitioner if he admitted having sex with the

victim. If petitioner told his attorney that the sex was consensual, counsel would have made more of this fact, rather than simply alluding to the lack of the girls' lack of credibility.[13]

Defense counsel's closing statement was much more detailed, but continued to focus on the womens' lack of credibility and the lack of evidence showing the violent struggle that they described. (T. 736-63). Counsel implied that A.S. may have had consensual sex that night, in more than one location and perhaps with more than one individual. (T. 758-59). Counsel implied that the vegetation found in the underwear bag could mean that A.S. had sex "outside some time earlier that night."[14] (T. 759). Counsel also argued that while lack of serious injury could occur in a rape situation, lack of injury also exists in a consensual situation. (T. 760-61). Related to this argument was counsel's statement that the room where the girls testified that they fought, were thrown, punched, and dragged was remarkably and inexplicably neat for such conduct to have occurred there. (T. 756-57). Counsel also argued that it was incredible that petitioner was avenging a killing, but that the women were not seriously injured. (T. 762). There were no bruises to A.S. other than the slight bleeding in one eye and the lacerations in her mouth. (T. 762).

In focusing on lack of evidence, and the inconsistencies and implausibility of the girl's testimony, counsel was attempting to put doubt in the jury's mind about the

---

[13] Counsel kept her opening vague perhaps so that the jury would either disbelieve the stories entirely or determine that the victim consented to the encounter.

[14] The Appellate Division's decision also stated that if petitioner told his attorney that he had sex with A.S. in the park, counsel would have made more of the fact that "vegetation" was found in the victim's underwear. 82 A.D.3d at 68.

events of the night in question. The jury essentially was presented with a similar scenario as if petitioner had testified. However, if petitioner had testified, the jury would also have heard that he was a drug dealer and was previously convicted of possession of a weapon. The fact that petitioner did not testify probably helped his chances more than hurt them. The Appellate Division's finding that petitioner was not prejudiced by counsel's error was not an unreasonable application of *Strickland*, and petitioner's ineffective assistance of counsel claim may be dismissed in its entirety.

## IV. Jury Instruction/Evidentiary Ruling/Identification Testimony

Petitioner alleges that the trial court erred in failing to issue a *falsus in uno* instruction in response to a note from the jury. Petitioner also argues that the court erred in allowing Nurse Barr to testify as to the reason for the victim's lack of injuries. Finally, petitioner argues that petitioner was deprived of a fair trial when the victim was allowed to testify that she previously identified petitioner. Respondent argues that none of these claims are exhausted, but they should be deemed exhausted and subject to dismissal based on procedural default, and in the alternative that none of the claims are cognizable in federal habeas corpus.

### A. Jury Instruction

During deliberations, the jurors sent out a note asking the following question:

> As a juror, do I have to believe in witness's credibility first, in order to make an evaluation of the full evidence? (i.e. → can't make a judgment because I don't believe the witnesses). Can credibility <u>evolve</u> with evaluation of physical evidence?

(Dkt. No. 12 at CM/ECF p. 301). Defense counsel requested that the court include a

*falsus in uno* charge[15] in its response to the question (T. at 830), but the court instructed the jury only that in evaluating a witness's credibility, the jurors could consider whether that witness's testimony is consistent with the physical evidence. (T. 832-33). The court disagreed that the *falsus in uno* instruction was exactly responsive to the question, and stated that "I'd be happy [to give the instruction], but I just don't know how to segue . . . it in there, I'd have to fit it in with a shoe horn . . . ." (T. 830).

On appeal, petitioner argued that the failure to give this instruction denied petitioner a "fair trial" because credibility of the witnesses was a central issue in the case. (Pet'r's App. Br. at 31-34; Dkt. No. 12 at 41-44). Counsel did not cite the federal constitution, and did not cite to any federal constitutional principles. The prosecutor's brief did not cite any federal constitutional cases or principles. The mere mention of the denial of a "fair trial" is not sufficient for purposes of exhaustion. *See Deleshne v. Conway*, 7 F. Supp. 2d 487, 497 (S.D.N.Y. 2010) (the exhaustion requirement is not automatically satisfied every time an alleged trial error is claimed to deny the defendant a 'fair trial.") (citing *Kirksey v. Jones*, 673 F.2d 58, 60 (2d Cir. 1982)). *See also Petrucelli v. Coombe*, 735 F.2d 684, 688 (2d Cir. 1984) (mere statement that due process right to a fair trial has been denied is not sufficient to fairly alert the state court to a federal constitutional claim).

Challenges to jury instructions are generally matters of state law that are not

---

[15] A *falsus in uno* charge instructs the jury that if the jurors find that a witness has intentionally testified falsely as to any material fact, the juror may disregard that witness's entire testimony, or the juror may disregard so much of the testimony as he or she finds was untruthful, while accepting the part that the juror finds was truthful. *DiPalma v. State*, 90 A.D.3d 1659, 1660 (4th Dep't 2011) (citations omitted) (discussing the definition of *falsus in uno*).

cognizable in a habeas corpus action. *See Cupp v. Naughten*, 414 U.S. 141, 146, (1973); *United States ex rel. Smith v. Montanye*, 505 F.2d 1355, 1359 (2d Cir.1974) (The propriety of a state trial court's jury instruction is ordinarily a matter of state law that does not raise a federal constitutional question.) Thus, the assertion of a challenge to jury instructions is not, without more, well within the mainstream of constitutional litigation, nor does it call to mind a specific right protected by the Constitution.[16]

## B. Evidentiary Ruling

During the trial, Nurse Barr was allowed to testify, over counsel's objection, that the lack of injury to A.S. could be attributable to the lack of a struggle, due to petitioner's use of a weapon. (T. 546-47). On appeal, petitioner's counsel argued that this testimony was erroneously admitted because Barr was not qualified as an expert. (Pet'r's Br. at 34-37; Dkt. No. 12 at CM/ECF pp.44-47). Counsel cited only New York State cases, and her argument contained no federal constitutional analysis. The prosecutor's brief was also based upon state law arguments. (People's Br. at 54-58;

---

[16] The court would point out that even it if were considering the merits of petitioner's claim, the trial court did not err in failing to give the *falsus in uno* charge in response to the jury's question. The original instructions contained a specific statement that

> You may accept all of what a witness says, none of what a witness says or part of what a witness says. When I say you, I'm talking about you as an individual juror. You can believe all of what witness M said, two-thirds of what witness D said and none of what witness J said.

(T. 785). The jury question specifically addressed the determination of a witness's credibility and whether credibility could be established by the statement's consistency with the physical evidence. Judge Brunetti's response was appropriate for the question. Thus, the petitioner's claim would also fail on the merits.

Dkt. No. 12 at CM/ECF pp.518-522).

Erroneous evidentiary rulings do not automatically rise to the level of a constitutional violation. *Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988). An evidentiary ruling is only redressable in a federal habeas corpus proceeding if there is a showing an error "of constitutional dimension," that deprived him of "fundamental fairness." *Id.* Thus, the mere claim based on an erroneous evidentiary ruling does not serve to exhaust the claim for federal habeas corpus purposes. Petitioner in this case has, therefore, failed to exhaust his state court remedies regarding his evidentiary claim.

## C. Identification/Bolstering Claim

Petitioner claims that the trial court denied petitioner a fair trial when the victim was allowed to testify that she identified petitioner in an out-of-court proceeding. On appeal, petitioner's counsel argued that absent the defendant "opening the door" to such evidence, it was improper bolstering for the prosecution to elicit from an identifying witness the fact that he or she previously identified the defendant. (Pet'r's Br. at 37-39; Resp't's Ex. A at CM/ECF pp.47-49).

Petitioner's appellate counsel did not cite to the federal constitution, nor did she cite to any state cases citing to, or analyzing, federal constitutional principles. The prosecutor also did not cite to any federal case law or principles. Thus, the bolstering claim is not exhausted.[17]

---

[17] The court notes that regardless of the lack of exhaustion, a claim of improper "bolstering" is akin to an erroneous evidentiary ruling and does not rise to the level of a cognizable federal claim. *Castaldi v. Poole*, No. 07-CV-1420, 2013 WL 789986, at *7 (E.D.N.Y. Mar. 1, 2013) (citations omitted). "'The concept of 'bolstering' really has no place as an issue in criminal jurisprudence based

## D.    Procedural Default

Although petitioner's jury instruction and evidentiary ruling claims, and bolstering claims are not exhausted, petitioner cannot return to state court to raise either claim.  Petitioner raised all three record-based claims in his direct appeal.  He cannot return to raise the same claims in the Appellate Division, and as stated above, the New York Court of Appeals only allows one request for review.  Because his claims are record-based, he cannot return to the trial court and assert them in a second section motion to vacate.  Thus, petitioner's claims are "deemed" exhausted, but subject to a procedural default analysis.

---

on the United States Constitution.  It is at most a New York State rule or policy derived from *People v. Trowbridge* . . . Violation of the *Trowbridge* rule, as is so with regard to many such state court rules, does not rise to a constitutional level.'" *Ayala v. Hernandez*, 712 F. Supp. 1069, 1074 (E.D.N.Y. 1989) (omission in original) (quoting *Snow v. Reid*, 619 F. Supp. 579, 582 (S.D.N.Y. 1985)). *See also Hodge v. Henderson*, 761 F. Supp. 993, 1008 (S.D.N.Y. 1990), *aff'd*, 929 F.2d 61 (1991) (no cognizable federal issue in bolstering claim); *Campbell v. Poole*, 555 F. Supp. 2d 345, 371 (W.D.N.Y. 2008) (improper bolstering is not cognizable on federal habeas review).  In this case, it was the victim who alluded to her own out-of-court identification of the petitioner. (T. 417).  She originally testified that she never saw the face of her attacker, but recognized him by his other attributes as someone she knew as "Alfie." (T. 367, 377).  She identified the petitioner in the courtroom and later testified that she found out that Alfie was Pierre Cosby.  She called the police with this information. (T. 406-407, 416).  The prosecutor then asked A.S. what happened, and she said "I identified him." (T. 417).  Defense counsel objected.  The trial court immediately sustained the objection and instructed the jury to disregard the answer, stating that "[i]t's not evidence of anything in this case." (T. 417).  Judge Brunetti reserved on the defendant's motion for a mistrial, stating that he would research the issue and give curative instructions. (T. 427).  The trial court likened the testimony to a "*Trowbridge*" violation, although *Trowbridge* did not deal with the victim testifying that she identified the defendant. *See People v. Trowbridge*, 305 N.Y. 471 (1953).  The court ultimately found that as long as there was no reference to a photographic identification, which could tip the jury off to the fact that petitioner may have had a prior criminal record, there would be no prejudice to the defendant.  The objectionable testimony was stricken from the record, and ultimately, the witness only referred in passing to an identification, without further elaboration.  Finally, although petitioner argued on appeal that the victim's testimony was the only identification, there was DNA evidence that petitioner was the attacker.  The court would point out that petitioner's new story is that he and the victim had consensual sex, so either way, the victim's brief outburst did not deprive petitioner of a fair trial.

Petitioner has shown neither cause nor prejudice for failing to raise any of these claims as violations of the federal constitution, and as stated above, has not produced any new evidence showing that he is "actually innocent" of the charges. Thus, petitioner's second, third, and fourth claims may be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the petition be **DENIED and DISMISSED**, and it is

**RECOMMENDED**, that a certificate of appealability be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: October 22, 2013

Hon. Andrew T. Baxter
U.S. Magistrate Judge